198

COMPUTER AND COMMUNICATIONS INDUSTRY ASSOCIATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

North American Telephone Association, Utilities Telecommunications Council, Tymnet, Inc., Continental Telephone Corporation, Xerox Corporation, Hazeltine Corporation, Alarm Industry Telecommunications Committee of the National Burglar & Fire Alarm Association, RCA Global Communications, Inc., Satellite Business Systems, Motorola, Inc., U.S. Telephone & Telegraph Corporation, American Petroleum Institute, Citicorp, Central Telephone & Utilities Corporation, Comsat General Corporation, American Newspaper Publishers Association, GTE Service Corporation, Sperry Univac Division of Sperry Corporation, Communications Satellite Corporation, International Business Machines Corporation, American Telephone & Telegraph Company, Computer & Business Equipment Manufacturers Association, Control Data Corporation, United Telephone System, Inc., United Computing Systems, Inc., Southern Pacific Communications Company, Western Union Telegraph Company, Aeronautical Radio, Inc., ISA Communications Services, Inc., Independent Data Communications Manufacturers Association, Inc., Association of Data Processing Service Organizations, Inc., Bunker Ramo Corporation, GTE Telenet Communications Corporation, Municipality of Anchorage d/b/a Anchorage Telephone Utility, Louisiana Public Service Commission, Intervenors.

The PEOPLE OF the STATE OF CALIFORNIA and the Public Utilities Commission of the State of California, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

International Business Machines Corp., et al., Intervenors.

INDEPENDENT DATA COMMUNICATIONS MANUFACTURERS ASSOCIATION, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

International Business Machines Corp., et al., Intervenors.

NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

International Business Machines Corp., et al., Intervenors.

AMERICAN NEWSPAPER PUBLISHERS ASSOCIATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

International Business Machines Corp., et al., Intervenors.

MOTOROLA, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

International Business Machines Corp., et al., Intervenors.

Nos. 80–1471, 81–1193, 81–1217, 81–1222, 81–1224 and 81–1226.

United States Court of Appeals, District of Columbia Circuit.

Argued March 22, 1982.

Decided Nov. 12, 1982.

John H. Chapman and Herbert E. Marks, Washington, D.C., with whom Laurel R. Bergold, Bernard M. Beerman, Brian E. Moran, and Daniel A. Huber, Washington, D.C., were on the joint briefs, for petitioners Computer and Communications Industry Ass'n and Independent Data Communications Mfrs. Ass'n, Inc., and intervenors Ass'n of Data Processing Service Organizations, Inc., Alarm Industry Telecommunications Committee of the Nat. Burglar & Fire Alarm Ass'n and Southern Pacific Communications Co.

Deborah A. Dupont, Deputy Asst. Gen. Counsel, National Association of Regulatory Utility Commissioners (NARUC), Washington, D.C., with whom William Paul Rodgers, Gen. Counsel and Charles D. Gray, Asst. Gen. Counsel, NARUC, Janice E. Kerr, J. Calvin Simpson and Gretchen Dumas, Attys., Public Utilities Commission of the State of California, San Francisco, Cal., and Michael R. Fontham, New Orleans, La., were on the briefs, for petitioners NARUC, State of Cal., and Public Utilities Com'n of the State of Cal., and for intervenor Louisiana Public Service Com'n.

Michael Yourshaw, Washington, D.C., with whom Aloysius B. McCabe, Kevin R. Jones, Robert J. Butler, W. Terry Maguire, and Pamela Riley, Washington, D.C., were on the brief, for petitioner/intervenor American Newspaper Publishers Ass'n (ANPA). Douglas R. Watts and Rodney L. Joyce, Washington, D.C., also entered appearances for ANPA.

John N. McCamish, Jr., and Andrew S. Viger, San Antonio, Tex., were on the brief for petitioner Datapoint Corp.

John L. Bartlett, Danny E. Adams, Susan Patrick Inzeo, Michael Yourshaw, Howard D. Polsky, and John F. Lyons, Washington, D.C., were on the brief for petitioner/intervenor Motorola, Inc.

N. Frank Wiggins, Washington, D.C., with whom Edwin B. Spievack, David M. Rickless, Washington, D.C., and Victor J. Toth, Reston, Va., were on the brief, for intervenors North American Telephone Ass'n (NATA) and Wisconsin Telecommunications Contractors Ass'n (WTCA). Ian D. Volner, Washington, D.C., also entered an appearance for NATA and WTCA.

James H. Laskey, Atty., U.S. Dept. of Justice, Washington, D.C., with whom Barry Grossman, Atty. U.S. Dept. of Justice, Washington, D.C., was on the brief, for respondent USA.

John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., Washington, D.C., with whom Stephen A. Sharp, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Jane E. Mago and Michael D. Sullivan, Counsel, FCC, Washington, D.C., were on the brief, for respondent FCC. Jack David Smith, Counsel, FCC, Washington, D.C., also entered an appearance for respondent FCC.

Joseph Mordecai Kittner, Washington, D.C., with whom Carl R. Ramey, Edward P. Taptich, Lawrence J. Movshin and John S. Voorhees, Washington, D.C., were on the brief, for intervenor Computer & Business Equipment Mfrs. Ass'n (CBEMA). Virginia S. Carson, Washington, D. C., also entered an appearance for CBEMA.

Michael Boudin, Washington, D.C., with whom J. Mark Iwry, Carolyn F. Corwin, Washington, D.C., Alfred A. Green and Howard J. Trienens, New York City, were on the brief, for intervenor American Tel. & Tel. Co. (AT & T). Stuart A. Stock, Washington, D.C., also entered an appearance for AT & T.

J. Roger Wollenberg, Washington, D.C., with whom David R. Anderson, William T. Lake, Roger M. Witten, Jane Tucker Dana and Jonathan Becker, Washington, D.C., were on the brief, for intervenor IBM Corp.

James R. Hobson, Washington, D.C., was on the brief for intervenors GTE Service Corp. and GTE Telenet Communications Corp. Philip M. Walker, Donald E. Ward, Washington, D.C., William R. Malone, Huntsville, Tex., and Richard McKenna, Washington, D.C., also entered appearances for intervenor GTE Telenet Communications Corp.

Joseph P. Markoski, Washington, D.C., was on the brief for intervenor Honeywell, Inc. Thomas J. Gallagher, Washington, D.C., also entered an appearance for Honeywell, Inc.

Arthur B. Sackler, Washington, D.C., was on the brief for intervenor Nat. Newspaper Ass'n.

Bernard M. Beerman and Brian E. Moran, Washington, D.C., were on the brief for intervenor Alarm Industry Telecommunications Committee of the National Burglar & Fire Alarm Ass'n (AITC).

Stephen R. Bell, Washington, D.C., entered an appearance for intervenor Tymnet, Inc.

Charles M. Meehan and Shirley S. Fujimoto, Washington, D.C., entered appearances for intervenor Utilities Telecommunications Council.

Thomas L. Jones and John Wohlstetter, Washington, D.C., entered appearances for intervenor Continental Telephone Corp.

John R. Murphy and Lawrence W. Secrist, III, Washington, D.C., entered appearances for intervenor Xerox Corp.

Lawrence M. DeVore, Washington, D.C., entered an appearance for intervenor Communications Satellite Corp.

John B. Gantt, Washington, D.C., entered an appearance for intervenor COMSAT Gen. Corp.

Alan Raywid, Washington, D.C., entered an appearance for intervenor Sperry Univac Div. of Sperry Corp.

Victor E. Ferrall, Jr., and Linda K. Smith, Washington, D.C., entered appearances for intervenors Control Data Corp. and Hazeltine Corp.

John M. Lathschuetz, Carolyn C. Hill and John W. Hunter, Washington, D.C., entered appearances for intervenor United Computing Systems, Inc. and United Telephone Systems, Inc.

John V. Kenny, Washington, D.C., entered an appearance for intervenor Southern Pacific Communications Co.

Joel Yohalem, Washington, D.C., entered an appearance for intervenor Western Union Telegraph Co.

John L. Bartlett, Washington, D.C., entered an appearance for intervenor Aeronautical Radio, Inc.

Norman P. Leventhal, Washington, D.C., entered an appearance for intervenor ISA Communications Services, Inc.

Tedson J. Meyers, Michael W. Faber and Robert J. Miller, Washington, D.C., entered appearances for intervenors Bunker Ramo Corp. and Citicorp.

Michael L. Glaser, Kathy J. Bible and Francis E. Fletcher, Jr., Washington, D.C., entered appearances for intervenor Municipality of Anchorage d/b/a Anchorage Telephone Utility.

Theodore D. Frank, Washington, D.C., entered an appearance for intervenor Central Telephone & Utilities Corp.

Wayne V. Black, Larry S. Solomon, Stark Ritchie and David E. Lindgren, Washington, D.C., entered appearances for intervenor American Petroleum Institute.

John A. Ligon, New York City, entered an appearance for intervenor U.S. Tel. & Tel. Corp.

William D. English, Harold David Cohen and Jack N. Goodman, Washington, D.C., entered appearances for intervenor Satellite Business System.

Alexander P. Humphrey, IV, Washington, D.C., entered an appearance for intervenor RCA Global Communications, Inc.

William J. Byrnes, John M. Pelkey and Ruth S. Baker Battist, Washington, D.C., entered appearances for intervenor MCI Telecommunications Corp.

Stephen M. Feldman, Washington, D.C., entered an appearance for intervenor American Business Press, Inc.

Nathan M. Norton, Jr., Chairman, Arkansas Public Service Com'n, Washington, D.C., was on the brief for amicus curiae State of Ark., urging that the FCC's decision be set aside.

Philip J. Mause, Norman A. Pedersen, Washington, D.C., and Steven M. Schur, Madison, Wis., were on the brief for amicus curiae The Public Service Com'n of Wis., urging that the FCC's decision be set aside.

Horace S. Libby and David Moskovitz, Augusta, Maine, were on the brief for amicus curiae The Maine Public Utilities Com'n, urging that the FCC's decision be set aside.

Carl L. Evans, Stanley W. Foy and Gary A. Tomlin, Montgomery, Ala., were on the brief for amicus curiae Alabama Public Service Com'n, urging that the FCC's order be reversed and remanded with instructions.

Henry Geller, Washington, D.C., was on the brief for amicus curiae Henry Geller, urging affirmance.

Warren Spannaus, Atty. Gen. of the State of Minn., St. Paul, Minn., was on the statement in lieu of brief for amicus curiae Dept. of Public Service of the State of Minn., urging that the FCC's decision be set aside.

Evan Wilner and Sandra Minch Hodes, Baltimore, Md., were on the statement in lieu of brief for amicus curiae Office of People's Counsel of Md., urging that the FCC's decision be set aside.

Donald A. Law, Asst. Gen. Counsel for the State of Kan., Topeka, Kan., was on the brief for amicus curiae The State Corp. Com'n of the State of Kan., urging that the FCC's decision be set aside.

William B. Gundling and Robert S. Golden, Jr., Asst. Attys. Gen. for the State of Conn., Hartford, Conn., were on the statement in lieu of brief for amicus curiae Dept. of Public Utility Control of the State of Conn., urging that the FCC's decision be set aside.

Before TAMM and EDWARDS,* Circuit Judges, and JAMES F. GORDON,** U.S. Senior District Judge for the Western District of Kentucky.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

This is a review of a Federal Communications Commission (Commission) rulemaking proceeding known throughout the telecommunications industry as the *Second Computer Inquiry* or simply *Computer II.*[1] Responding to monumental changes in the technological and economic conditions of the communications marketplace, the Commission in *Computer II* overhauled the regulatory regime governing the interrelationship of telecommunications and data processing. Eight petitioners and scores of intervenors challenge the Commission's new rules on myriad grounds. In our view, the Commission's action in adopting these rules was neither arbitrary nor capricious, nor did it constitute an abuse of discretion. We are

---

* Circuit Judge Edwards did not participate in the disposition of this case.

** Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

1. The Federal Communications Commission (Commission) orders comprising the *Computer II* decision are as follows: Final Decision, *In re* Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry), 77 F.C.C.2d 384 (1980) (*Computer II Final Decision*); Memorandum Opinion and Order, *In re* Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry), 84 F.C.C.2d 50 (1980) (*Computer II Reconsidered Decision*); Memorandum Opinion and Order on Further Reconsideration, *In re* Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry), 88 F.C.C.2d 512 (1981) (*Computer II Further Reconsidered Decision*). These orders will be referred to by their designated short forms in the text and footnotes that follow.

convinced that the regulatory scheme established in *Computer II* is a reasonable one within the scope of the Commission's authority under the Federal Communications Act of 1934, 47 U.S.C. § 151 *et seq.* (1976) (the Act). Accordingly, we affirm the Commission's decision in its entirety.

## I. BACKGROUND

The FCC first addressed the regulatory and policy problems posed by the growing interdependence of communications and data processing in a proceeding known as the *First Computer Inquiry* or *Computer I*,[2] begun in 1966.[3] The proceeding culminated in 1971 with the adoption of rules delineating the circumstances in which computer use by common carriers constituted common carrier communication subject to regulation under Title II of the Act[4] and when such use constituted unregulated data processing.[5] Under the *Computer I* regime, the Commission looked at the manner in which computerization was employed to determine how a service would be regulated. To facilitate this functional approach, the Commission distinguished between communications services using computers to perform message or circuit switching, which were regulated, and data processing services, which were left to marketplace competition.[6] The regulatory status of "hybrid" services, which combined both communications and data processing functions, was to be determined on a case-by-case basis depending upon which function was predominant.[7]

In *Computer I* the Commission also set forth the conditions under which a common carrier could enter the data processing marketplace. The rules required "maximum separation" of a common carrier's communications activities from its unregulated data processing services.[8] This requirement was designed to prevent common carriers from unfairly burdening their regulated communications services with costs properly attributable to unregulated data processing services.[9]

**2.** Tentative Decision of the Commission, *In re* Regulatory and Policy Problems Presented by the Interdependence of Computer and Communication Services and Facilities, 28 F.C.C.2d 291 (1970) (*Computer I Tentative Decision*); Final Decision and Order, *In re* Regulatory and Policy Problems Presented by the Interdependence of Computer and Communication Services and Facilities, 28 F.C.C.2d 267 (1971) (*Computer I Final Decision*), *aff'd in part and rev'd in part sub nom. GTE Service Corp. v. FCC*, 474 F.2d 724 (2d Cir.1973), *decision on remand*, 40 F.C.C.2d 293 (1973).

**3.** *See* Notice of Inquiry, *In re* Regulatory and Policy Problems Presented by the Interdependence of Computer and Communication Services and Facilities, 7 F.C.C.2d 11 (1966); Supplemental Notice of Inquiry, *In re* Regulatory and Policy Problems Presented by the Interdependence of Computer and Communication Services and Facilities, 7 F.C.C.2d 19 (1967).

**4.** The Communications Act of 1934, 47 U.S.C. § 151 *et seq.* (1976), is composed of three titles. Title I contains general provisions of the Act. *Id.* §§ 151–155. Title III provides for Commission regulation of broadcasting. *Id.* §§ 301–397. Title II, *id.* §§ 201–222, gives the Commission authority over common carrier interstate or foreign communication by wire or radio. The Commission has the power under Title II to adjudge the lawfulness of proposed charges, classifications, regulations, and prac-

tices, *id.* § 204, and if it finds them unlawful, to prescribe just and reasonable ones, *id.* § 205.

**5.** These rules are found at 36 Fed.Reg. 5345, 5353–54 (1971).

**6.** The Commission defined data processing as "use of a computer for the processing of information as distinguished from circuit or message-switching." *Computer I Tentative Decision*, 28 F.C.C.2d at 295. "Message-switching" was defined as "[t]he computer-controlled transmission of messages, between two or more points, via communications facilities, wherein the content of the message remains unaltered." *Id.* at 296.

**7.** *See Computer I Final Decision*, 28 F.C.C.2d at 276–79; *Computer I Tentative Decision*, 28 F.C.C.2d at 305.

**8.** The "maximum separation" requirement meant that common carriers could offer data processing services only through a separate corporate entity having separate accounting records, personnel, and equipment and facilities. *See Computer II Final Decision*, 77 F.C.C.2d at 391 n. 2.

**9.** *Computer I Final Decision*, 28 F.C.C.2d at 270–71. The Commission forbade AT & T to offer data processing even through a separate *subsidiary because the Commission then* assumed that AT & T's 1956 consent decree, *see*

The *Computer I* rules were sustained by the Second Circuit,[10] but even as they were being implemented, technological developments rendered them nearly obsolete.[11] As computer and communications technology continued to merge, the line between regulated and unregulated activities became increasingly blurred, and the *Computer I* definitions became unworkable.[12] In addition, both the data processing and the communications industries were becoming increasingly competitive [13] and therefore less susceptible to the type of abuses the Commission had sought to discourage through its *Computer I* rules.[14]

Thus, in 1976 the Commission instituted the *Second Computer Inquiry* to reexamine its definitional structure and to find a more workable regulatory approach.[15] Five years and thousands of pages of comments later, the Commission ended its study by making major changes in the regulatory regime. The Commission hopes that these changes will provide greater certainty and predictability of regulation for the subject companies and will enhance competition in communications and data processing.[16]

In *Computer II* the Commission abandoned the attempt to classify activities as either communications or data processing based on the nature of the processing performed. The respective technologies had become so intertwined, according to the Commission, that it had become impossible

discussion *infra* pages 45–47, precluded the company from offering data processing services. *Id.* at 282; *see Computer I Tentative Decision,* 28 F.C.C.2d at 298–99, 305.

**10.** *GTE Service Corp. v. FCC,* 474 F.2d 724 (2d Cir.1973). Certain provisions involving regulation of data processing services were set aside. *Id.* at 732–36, 737.

**11.** *See Computer II Final Decision,* 77 F.C.C.2d at 391–93.

**12.** For example, technological advances made it possible for significant data processing functions to be performed in numerous computer terminals distributed throughout the communications network rather than in just one central computer. *See id.* It therefore became increasingly difficult to classify terminals and services as either communications or data processing. AT & T's proposal in 1975 to market a sophisticated terminal device, the Dataspeed 40/4, highlighted the problems inherent in the *Computer I* definitional approach. The Dataspeed 40/4 had data processing capabilities that enabled it to perform some functions that would have been performed in a central computer at the time the 1971 rules were adopted. Thus, many argued that the Commission should reject AT & T's proposal because it was offering a hybrid data processing service. Although the Commission ultimately classified the Dataspeed 40/4 as a communications service, it recognized the inadequacy of the 1971 rules for dealing with new technologies. *See In re* American Telephone and Telegraph Co. (AT & T), 62 F.C.C.2d 21, 30–31 (1977), *aff'd sub nom. International Business Machines Corp. v. FCC,* 570 F.2d 452 (2d Cir.1978). Between 1975, when the Dataspeed 40/4 was first offered, and 1977, when the Commission determined that the Dataspeed 40/4 was primarily a communications service, consumers were deprived of this valuable new technology.

**13.** *See Computer II Final Decision,* 77 F.C.C.2d at 433–34.

**14.** In the telecommunications marketplace, the increase in competition is, in part, a result of Commission decisions allowing customer premises equipment (CPE) provided by noncommon carriers to be directly connected to the interstate communications network. Traditionally, common carriers limited access to their transmission services to customers with carrier-provided CPE. In its 1968 *Carterfone* decision, however, the Commission required carriers to provide access to transmission services to customers with non-carrier-provided CPE. Carterfone, 13 F.C.C.2d 420, *reconsid. denied,* 14 F.C.C.2d 571 (1968); *see* Interstate and Foreign Message Toll Telephone, 56 F.C.C.2d 593 (1975), *clarified,* 59 F.C.C.2d 83 (1976), *aff'd sub nom. North Carolina Utilities Comm'n v. FCC,* 552 F.2d 1036 (4th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977); *see also Computer II Final Decision,* 77 F.C.C.2d at 439–40. CPE includes the basic telephone, answering machines, key systems, and PBX switchboards.

**15.** *See* Notice of Inquiry and Proposed Rulemaking, *In re* Amendment of Section 64.702 of the Commission's Rules and Regulations, 61 F.C.C.2d 103, 107 (1976) (*Notice of Inquiry*); *see also* Supplemental Notice of Inquiry and Enlargement of Proposed Rulemaking, *In re* Amendment of Section 64.702 of the Commission's Rules and Regulations (Computer Inquiry), 64 F.C.C.2d 771 (1977) (*Supplemental Notice of Inquiry*).

**16.** *Computer II Final Decision,* 77 F.C.C.2d at 423, 428–30.

to draw an "enduring line of demarcation" between them.[17] In the course of its *Second Computer Inquiry,* the Commission concluded that the only clear and lasting distinction would be one between basic transmission service on the one hand and enhanced services and customer premises equipment (CPE) on the other.[18] According to the Commission, drawing the regulatory line in this way would minimize the type of ad hoc adjudication that had taken place under the 1971 rules.[19] In addition, such a distinction would make it possible to eliminate unneeded regulation and thereby promote efficient use of the telecommunications network.[20]

Under the *Computer II* scheme, the Commission continued to require common carriers to provide basic transmission services under tariff on an equal basis to all customers. The Commission found that enhanced services and CPE were not within the scope of its Title II jurisdiction but were within its ancillary jurisdiction.[21] Accordingly, the Commission discontinued Title II regulation of enhanced services and, with the exception of AT & T,[22] relieved common carriers of the "maximum separation" requirement

upon which their offerings of enhanced services were conditioned under *Computer I.*[23] Similarly, the Commission "unbundled" CPE from basic transmission services by discontinuing rate regulation of CPE and ordering that CPE be sold separately from basic communications service in a competitive market.[24] The *Computer II* rules also required common carriers to keep separate accounts of their regulated basic service and their competitive services. Thus, the carriers must sell their basic service to themselves at the tariff rate when they provide enhanced services to their customers. These requirements were designed to prevent "cross-subsidization" of a carrier's unregulated services by its regulated services.[25]

The Commission declared that its regulatory policy respecting interstate facilities or services preempted inconsistent state regulation of those services or facilities.[26] Although the Commission was careful to limit the area of preemption, some preemption of state regulation was deemed necessary because the same facilities are usually used for both interstate and intrastate communi-

17. *Id.* at 430.

18. Basic service is the offering of "a pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information." *Id.* at 419–20. Enhanced service is any service other than basic service. Enhanced service "combines basic service with computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information, or provide the subscriber additional, different, or restructured information, or involve subscriber interaction with stored information." *Id.* at 387. An example of enhanced service is AT & T's Dial It service, whereby subscribers dial a certain number to gain access to stored information such as the scores of professional sports contests. *See Computer II Reconsidered Decision,* 84 F.C.C.2d at 55.

19. *Computer II Final Decision,* 77 F.C.C.2d at 425, 434–35; *see* note 12 *supra.*

20. *Computer II Final Decision,* 77 F.C.C.2d at 387.

21. *Id.* at 431–35, 450–52; *see* notes 38–40 & 53–55 *infra* and accompanying text.

22. Because of AT & T's pervasive market power, the Commission decided to permit it to offer enhanced services only through a separate subsidiary. Originally the Commission decided to also subject GTE to this separate subsidiary requirement, *Computer II Final Decision,* 77 F.C.C.2d at 474, but, on reconsideration, exempted GTE, *Computer II Reconsidered Decision,* 84 F.C.C.2d at 72.

23. *Computer II Final Decision,* 77 F.C.C.2d at 388–89; *see* note 8 *supra.*

24. *Computer II Final Decision,* 77 F.C.C.2d at 388–89.

25. Cross-subsidization occurs when a carrier misattributes costs incurred in the provision of unregulated services to the provision of regulated services. Because rates for regulated services are based partially upon the cost of providing those services, misattribution of costs results in the carrier's monopoly ratepayers' bearing a part of the cost of unregulated services. *See id.* at 445, 476–77.

26. *Computer II Reconsidered Decision,* 84 F.C.C.2d at 104; *Computer II Further Reconsidered Decision,* 88 F.C.C.2d at 523–24, 541–42.

cations.[27] For the federal program of deregulation to work, state regulation of CPE and enhanced services had to be circumscribed.[28]

During its proceedings, the Commission considered the effect of the proposed regulatory changes on AT & T's continued offering of CPE and enhanced services in light of a 1956 consent decree limiting AT & T to providing services that are "subject to public regulation" and activities "incidental" thereto.[29] The Commission recognized that it could not definitively construe the decree[30] but stated its view that AT & T's participation in the new regulatory scheme would be consistent with the decree.[31]

## II. ANALYSIS

The arguments supporting and challenging the *Computer II* decision are as numerous as the parties before this court. Seemingly, every argument ever made in an administrative law case is pressed here in some form. We consider it unnecessary to address all the arguments presented to us, and grounds for challenging the Commission's decision not mentioned herein should be considered rejected. We will, however, address four of the most controversial aspects of the Commission's decision.

First, many contend that the Commission erred in concluding that CPE and enhanced services are not appropriate subjects for Title II regulation. Others argue that in its *Computer II* orders the Commission gave an unsupportably expansive reading to its ancillary jurisdiction to regulate non-Title II activities.

Second, many parties—particularly the state regulatory commissions—view the Commission's preemption of inconsistent state regulation as an invasion of ratemak-

ing authority reserved to the states under the Communications Act. These parties urge us to declare that the states continue to have authority to regulate CPE used jointly in interstate and intrastate commerce. In addition, these parties argue that the Commission failed to give adequate notice of its intention to preempt state regulation.

Third, some argue that the "maximum separation" requirement should have been imposed on other carriers in addition to AT & T. Various parties also believe that AT & T should have been subjected to tighter regulation than that contemplated under *Computer II*.

Finally, some parties contend that the Commission based its decision on a misinterpretation of the 1956 consent decree between AT & T and the United States. This issue has apparently been mooted by vacation of the consent decree as part of the recent settlement of the Justice Department's antitrust suit against AT & T. Nevertheless, we will address it briefly.

### A. The Deregulation of Enhanced Services and CPE

The most fundamental challenge to the *Computer II* decision is the claim that the Commission has impermissibly deregulated enhanced services, CPE, or both. Although framed in different ways by the various parties, the point of the argument is that the Commission is required to regulate carrier-provided enhanced services and CPE under Title II of the Act. We believe that the Commission's reading of the Act is supportable and that its concomitant regulatory scheme is a rational and amply explained policy choice.

---

**27.** *Computer II Final Decision,* 77 F.C.C.2d at 455–57.

**28.** *Computer II Further Reconsidered Decision,* 88 F.C.C.2d at 541 n. 34.

**29.** United States v. Western Electric Co., 1956 Trade Cas. (CCH) ¶ 68,246, at 71, 137–38 (D.N.J.1956); *see Computer II Reconsidered Decision,* 84 F.C.C.2d at 106.

**30.** *Computer II Final Decision,* 77 F.C.C.2d at 492.

**31.** *Computer II Reconsidered Decision,* 84 F.C.C.2d at 106; *see generally id.* at 105–09; *Computer II Final Decision,* 77 F.C.C.2d at 490–95.

We turn first to the Commission's treatment of enhanced services. Title II of the Act empowers the Commission to impose rate regulation only upon common carriers "engaged in interstate or foreign *communication* by wire or radio." [32] As the relationship between data processing and communications became increasingly close, the Commission decided in the *First Computer Inquiry* not to regulate the rates charged for data processing services.[33] This decision forced the Commission to evaluate case by case the character of new services combining data processing and communications to determine whether the new services were to be regulated.[34] By the time of the *Second Computer Inquiry*, this task had become practically impossible.[35] Consequently, the Commission was compelled to choose a new regulatory path to fulfill its statutory duty "to make available ... to all the people of the United States a rapid, efficient, Nationwide, and world-wide wire and radio communication service." [36]

Two paths were available to the Commission: regulate all combined data processing and communications services under Title II, or regulate none.[37] Electing the first path would have required the Commission to reverse its policy, established in *Computer I,* of not regulating data processing services and would also have required the Commission to confront the issue of its authority to exert Title II jurisdiction over data processing. Instead, the Commission chose the alternative course and decided not to impose Title II regulation on any combined data processing and communications services, which the Commission termed "enhanced services."

Although the Commission did not impose Title II regulation on enhanced services, it determined that it has ancillary jurisdiction over enhanced services under sections 152 and 153 of the Act. Section 152 gives the Commission jurisdiction over "all interstate and foreign communication by wire or radio," [38] and section 153 defines "communication by wire" as "the transmission of writing, signs, signals, pictures and sounds of all kinds ... incidental to such transmission." [39] The Commission found that enhanced services fall within its ancillary jurisdiction as incidental transmissions over the interstate telecommunications network.[40]

Nevertheless, the Commission declined to institute a comprehensive regulatory scheme for enhanced services. Because the Commission found that the market for enhanced services is "truly competitive," [41] it believes that market forces will protect the public interest in reasonable rates and availability of services. Therefore, in the Commission's view, comprehensive regulation of enhanced services would not be permissible because it would not be "directed at protecting or promoting a statutory purpose." [42] The one exception to the Commission's policy of not regulating enhanced services is its imposition of a structural separation requirement on AT & T under which AT & T can offer enhanced services to consumers only through a separate subsidiary.

In dealing with CPE the Commission faced a dilemma similar to the one it confronted in the case of enhanced services. Traditionally, the Commission required CPE provided by common carriers to be included in the tariffs for their transmission services

---

**32.** 47 U.S.C. § 201(a) (1976) (emphasis added).

**33.** *See Computer II Final Decision,* 77 F.C.C.2d at 390.

**34.** *See id.*

**35.** *Id.* at 393.

**36.** 47 U.S.C. § 151 (1976).

**37.** *Computer II Final Decision,* 77 F.C.C.2d at 428.

**38.** 47 U.S.C. § 152(a) (1976).

**39.** *Id.* § 153(a)–(b).

**40.** *Computer II Final Decision,* 77 F.C.C.2d at 432.

**41.** *Id.* at 433.

**42.** *Id.,; see United States v. Southwestern Cable Co.,* 392 U.S. 157, 175–78, 88 S.Ct. 1994, 2004–05, 20 L.Ed.2d 1001 (1968).

under Title II. This "bundling" of equipment charges into transmission rates was, in effect, Title II regulation of CPE, justified on the ground that equipment like the telephone handset was part of an "end-to-end" common carrier service.[43] In recent years, however, CPE has evolved from the "plain old telephone," which merely sends and receives communications signals, into sophisticated home computer terminals like the Dataspeed 40/4 [44] that incorporate both communications and data processing elements. Additionally, non-common carriers are now competitively furnishing CPE for connection with common carrier transmission lines.[45] These developments cast doubt on the propriety of the continued bundling of CPE charges into carrier transmission rates since, as the Commission found, bundling limits the range of CPE available to consumers.[46]

Thus, the Commission again faced a regulatory crossroads. Because the Commission had decided in *Computer I* not to regulate data processing services,[47] it first considered an approach that would have determined the regulatory status of CPE by classifying it as either communications or data processing.[48] Finding that such a demarcation would inhibit innovation in the production and marketing of CPE by fostering regulatory uncertainty, the Commission discarded the definitional approach, as it had with enhanced services.[49] The Commission was then left with the choice of regulating all CPE under Title II or regulating none. The Commission made the same choice it had made in the case of enhanced services:

no CPE would be regulated under Title II.[50] The Commission determined that CPE is not common carrier communications within the scope of Title II [51] and further found that charges for CPE provided by carriers need no longer be regulated via bundling because of the competitive market conditions now prevailing.[52]

Although the Commission discontinued Title II regulation of CPE, it exerted ancillary jurisdiction over carrier-provided CPE. As it had with enhanced services, the Commission found that CPE is within the scope of sections 152 and 153 of the Act, which gives the Commission jurisdiction over "all instrumentalities, facilities, apparatus, and services . . . incidental to" [53] "interstate and foreign communication by wire or radio." [54] The exertion of jurisdiction over CPE pursuant to these sections was justified, the Commission found, because including CPE charges in tariffs has a direct effect upon interstate transmission rates.[55] The Commission therefore ordered, first, that all CPE be unbundled from transmission services; that is, no carrier can offer CPE as part of a transmission offering. Second, the Commission ordered that AT & T can offer CPE only through a separate subsidiary. These requirements were designed to ensure fair competition in the CPE market and to prevent AT & T from cross-subsidizing its competitive services through its monopoly services.

Clearly, the Commission's decisions with regard to enhanced services and CPE are complementary. In both cases the Commission confronted rapid technological and

---

43. *See Computer II Final Decision*, 77 F.C.C.2d at 446; *Computer II Reconsidered Decision*, 84 F.C.C.2d at 99.

44. *See* note 12 *supra*.

45. *See Computer II Final Decision*, 77 F.C.C.2d at 439–41.

46. *Id.* at 442.

47. *See* text accompanying notes 2–9 *supra*.

48. *See Computer II Final Decision*, 77 F.C.C.2d at 436.

49. *Id.*

50. *Id.* at 439.

51. *Computer II Reconsidered Decision*, 84 F.C.C.2d at 61, 65.

52. *Computer II Final Decision*, 77 F.C.C.2d at 439.

53. 47 U.S.C. § 153(a) (1976).

54. *Id.* § 152; *see Computer II Final Decision*, 77 F.C.C.2d at 450–52.

55. *Computer II Final Decision*, 77 F.C.C.2d at 441–46.

market changes and attempted to draw definitional boundaries for the purpose of limiting Title II regulation. In both cases this task proved impossible, and the Commission therefore decided to treat all enhanced services and all CPE alike and remove them from the scope of Title II. The Commission relied in both cases on newly emergent market forces and the exercise of its own ancillary jurisdiction to protect the public interest by assuring availability of enhanced services and CPE at reasonable prices.

The parties' challenges to the Commission's regulatory scheme rest primarily on two bases: first, that the Commission is guilty of impermissible forbearance from Title II regulation in discontinuing rate regulation of all enhanced services and CPE, and second, that the Commission overreached its ancillary jurisdiction in imposing the separation requirement on AT & T and ordering the unbundling of CPE. We view the Commission's decision in *Computer II* as a demarcation of the scope of Title II jurisdiction in a volatile and highly specialized field and a concomitant substitution of alternative regulatory tools for traditional Title II regulation in this field. Our analysis proceeds from this foundation.

■ We first address the Commission's finding that enhanced services and CPE are not common carrier services within the scope of Title II. As we understand it, the Commission's finding in regard to enhanced services has two alternative bases. First, the Commission found that the provision of an enhanced service is not a common carrier activity and, thus, is outside the scope of Title II.[56] Alternatively, the Commission found that even if some enhanced services might be common carrier communications activities within the reach of Title II, it is not required to identify those services and

subject them to Title II regulation.[57] A policy of identifying regulable enhanced services would, in the Commission's view, be a reversion to the futile *Computer I* case-by-case approach that inhibited technological innovation and diverted Commission resources from more beneficial activities.[58]

Likewise, the Commission's decision that CPE is not within the scope of Title II rests on two bases. First, the Commission determined that CPE is not itself a common carrier communication service regulable under Title II. In reaching this conclusion, the Commission noted that competition in the CPE market and innovation in the CPE industry occurring apart from the telecommunications network demonstrate that CPE is severable from communications transmission services. Second, the Commission determined that charges for carrier-provided CPE, which traditionally have been regulated in connection with the carrier's provision of transmission services, need no longer be regulated because the new competition in the CPE industry will assure the availability of CPE at reasonable prices.

We believe the Commission's decision not to subject enhanced services or CPE to Title II regulation is sustainable on either of the grounds asserted by the Commission. The Commission's finding that enhanced services and CPE are not common carrier communications activities within Title II is reasonable. Although the Act authorizes regulation of the rates charged for common carrier services, it does not define the term "common carrier." We have noted previously that "the term 'common carrier' has a coherent legal meaning which courts can grasp and apply in reviewing the Commission construction of its own Act."[59] In *National Association of Regulatory Utility Commissioners v. FCC*, 525 F.2d 630 (D.C. Cir.), *cert. denied*, 425 U.S. 992, 96 S.Ct.

56. *Id.* at 430–32.

57. *Id.* at 434–35.

58. *Id.* at 426–27, 434–35.

59. *National Ass'n of Regulatory Utility Comm'rs v. FCC*, 533 F.2d 601, 618 (D.C.Cir. 1976) (*NARUC II*) (opinion of Wilkey, J.) (foot-

note omitted). It is clear that an entity can be a common carrier with respect to only some of its activities. *Id.* at 608. In this opinion the term "common carrier" will be used to indicate not an entity but rather an activity as to which an entity is a common carrier.

2203, 48 L.Ed.2d 816 (1976) (*NARUC I*), we observed that the essential element of common carriage is the carrier's undertaking " 'to carry for all people indifferently.' "[60] In the communications context, this means providing a service whereby customers may " 'transmit intelligence of their own design and choosing.' "[61]

In *Computer II* the Commission found that enhanced services are not the kind of general public offerings this court regarded as common carriage in *NARUC I.* Inherent in enhanced service offerings is the ability of vendors to tailor their services to meet the particularized needs of individual customers.[62] In the Commission's view, this characteristic distinguishes enhanced services from basic services, which are subject to traditional Title II regulation. Further, the Commission found that the severability of CPE from transmission services and the competitive nature of the CPE market demonstrated that CPE is not within the definition of common carriage.

We believe the Commission's judgment that enhanced services do not constitute common carrier communications activities is reasonable and amply supported. The Commission's finding was based upon intensive study of a rapidly changing and highly technical field and was informed by the comments of a large number of participants in the communications and data processing industries. Given the great variety of specialized enhanced services now available to consumers, it is reasonable to find that providers of these services generally are not common carriers because they will "make individualized decisions in particular cases whether and on what terms to serve."[63]

Likewise, the Commission's judgment that CPE is not a common carrier service within Title II is clearly supported. CPE was originally regulated under Title II because regulation was thought necessary for the effective functioning of the interstate communications network, a premise that the Commission has now rejected as fallacious.[64] The severability of CPE from underlying common carrier transmission services, demonstrated by the healthy competition in the CPE market by non-common carriers, supports the Commission's conclusion that CPE is not a common carrier activity within Title II. Moreover, as in any competitive market, provision of CPE is based upon "individualized decisions in particular cases, whether and on what terms to deal,"[65] the hallmark of a non-common carrier service.

We also find that the Commission's decision is sustainable on the alternative policy ground. We agree with the Commission that even if some enhanced services could be classified as common carrier communications activities, the Commission is not required to subject them to Title II regulation where, as here, it finds that it cannot feasibly separate regulable from nonregulable services. To the extent that certain enhanced services could lawfully be regulated under Title II once they were identified as common carrier services, we sanction the Commission's forbearance from Title II regulation. We emphasize, however, that our sanction is a very narrow one, given in light of the peculiar nature of the communications and data processing industries and the alternative regulatory scheme adopted by the Commission.

The Commission's announced policy is to promote the "efficient utilization and full exploitation of the interstate telecommuni-

**60.** *National Ass'n of Regulatory Utility Comm'rs v. FCC,* 525 F.2d 630, 640 (D.C.Cir. 1976) (*NARUC I*) (quoting *Semon v. Royal Indemnity Co.,* 279 F.2d 737, 739 (5th Cir. 1960)).

**61.** *Id.* at 641 n. 58 (quoting Industrial Radiolocation Service, 5 F.C.C.2d 197, 202 (1966)).

**62.** *Computer II Final Decision,* 77 F.C.C.2d at 431.

**63.** *NARUC II,* 533 F.2d at 609 (footnote omitted).

**64.** *Computer II Final Decision,* 77 F.C.C.2d at 446.

**65.** *NARUC I,* 525 F.2d at 641 (footnote omitted).

cations network." [66] This can be best accomplished, in the Commission's view, by regulating the rates of only those activities *clearly* within the scope of Title II.[67] This policy, combined with the Commission's decision in *Computer I* not to regulate data processing services under Title II,[68] compelled the Commission's decision to repudiate an ad hoc approach to determining which enhanced services were regulable as common carrier services. Such case-by-case determinations, the Commission found, would defeat the purpose of the Communications Act, first, by creating regulatory uncertainty that would inhibit market entry and thus limit the range of services available to consumers and, second, by absorbing Commission resources that would be better employed elsewhere.[69]

Instead of regulating enhanced services under Title II, the Commission used its ancillary jurisdiction to impose upon AT & T a structural regulation scheme that requires AT & T to offer enhanced services only through a separate subsidiary. The Commission found that this separation requirement will effectively protect the public interest by limiting the power of AT & T to gain an unfair advantage in the marketplace by cross-subsidizing its competitive services by its monopoly ones. We believe this to be a sufficient basis to support the Commission's decision not to regulate enhanced services under Title II. Once the difficulty of isolating activities subject to Title II regulation outweighs the benefits to be gained by that regulation, then the Commission is justified in conserving its energies for more efficacious undertakings, at least when it establishes an alternative regulatory scheme under its ancillary jurisdiction.

As it did in the case of enhanced services, the Commission decided on policy grounds not to regulate some CPE—carrier-provided CPE—that it could have permissibly regulated under Title II. This forbearance is lawful. We have already upheld the Commission's finding that provision of CPE is not itself a common carrier activity within Title II. Thus, the Commission could regulate the rates for carrier-provided CPE only if it were necessary to ensure the availability of Title II-regulated communications service at reasonable rates. The Commission found that CPE is now available in an increasingly competitive market, which indicates that CPE will be available at reasonable prices. The Commission further found that discontinuing Title II regulation of all CPE will create economic incentives for carriers to structure services so that customers pay only for what they need.[70] These findings amply support the Commission's conclusion that regulation of charges for carrier-provided CPE is not necessary to protect the public interest.

Instead of regulating charges for CPE, the Commission has, as in the case of enhanced services, exercised its ancillary jurisdiction to forbid carriers from offering CPE as part of a transmission service and to require AT & T to provide CPE only through a separate subsidiary. The Commission believes that these regulations will ensure healthy competition in the CPE market and will protect the free market forces which will ensure the availability of CPE at reasonable prices by preventing AT & T from cross-subsidizing its competitive services through its monopoly services. We have previously noted our reluctance "to declare that free market forces must be supplanted by rate regulation when neither Congress nor the [agency] has found it essential." [71] We do not believe that Con-

---

66. *Computer II Final Decision*, 77 F.C.C.2d at 429.

67. *Id.*

68. That decision was largely upheld by the Second Circuit in *GTE Service Corp. v. FCC*, 474 F.2d 724 (2d Cir.1973). The two rules struck down in *GTE Service Corp.* are not relevant here.

69. *Computer II Final Decision*, 77 F.C.C.2d at 429–30, 434–35.

70. *Id.* at 429–30.

71. *National Ass'n of Theatre Owners v. FCC*, 420 F.2d 194, 204 (D.C.Cir.1969), *cert. denied*, 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970).

gress required the Commission to regulate carrier-provided CPE under Title II when the agency has determined that an alternative regulatory scheme would more effectively further the goals of the Act. Since the agency's view on this point is reasonable and well supported, we refuse to require the Commission to regulate carrier-provided CPE under Title II.

Our approval of limited forbearance from Title II regulation of common carrier services by the Commission does not give the Commission unfettered discretion to regulate or not regulate common carrier services. This is not a case in which the Commission has attempted to end Title II regulation without substituting other regulatory tools. In *Philadelphia Television Broadcasting Co. v. FCC*, 359 F.2d 282 (D.C.Cir. 1966), we upheld the Commission's decision to regulate CATV systems as "adjuncts of the nation's broadcasting system" [72] rather than as common carriers under Title II, even though we assumed that CATV systems were common carriers. We concluded that the latitude accorded the Commission by Congress in dealing with new communications technology includes the discretion to forbear from Title II regulation.[73] Here, as in *Philadelphia Television,* we are faced only with the issue whether the Commission's discretion extends to deciding *what regulatory tools to use in regulating common carrier services:*

> In a statutory scheme in which Congress has given an agency various bases of jurisdiction and various tools with which to protect the public interest, the agency is entitled to some leeway in choosing *which* jurisdictional base and *which* regulatory tools will be most effective in advancing the Congressional objective.[74]

The Second Circuit recently addressed a regulatory scheme similar to that established in *Computer II* and upheld the Commission's action. In *Western Union Tele-*

*graph Co. v. FCC,* 674 F.2d 160 (2d Cir. 1982), the court reviewed a Commission order requiring international record carriers to remove their offerings of Telex terminal equipment from tariff. The court upheld the deregulation on alternative grounds. The Commission determined that provision of terminal equipment is not a common carrier communications service in the traditional sense, and the court held this to be reasonable. In the court's view, the petitioners had offered "nothing which casts doubt on the Commission's conclusion that the manufacture and provision of terminal equipment are highly competitive and involve many firms which are not communications carriers. To find in such circumstances that providing terminal equipment is not a communications service is hardly irrational." [75]

Moreover, the court rejected petitioners' allegation that continued Title II regulation of terminal equipment was necessary to realize the Commission's statutory goals: "While [petitioners] might believe that IRC transmission rates could be better controlled if equipment remained tariffed, the Commission has broad discretion to choose which regulatory tools to employ ... and its decision must be upheld unless it is irrational ...." [76] The regulatory tools that the court found reasonable were newly unleashed market forces buttressed by the likely future entry of Western Union into the international Telex market.[77] Because the Commission did not attempt to exercise ancillary jurisdiction over the provision of Telex terminal equipment, the regulatory scheme upheld by the Second Circuit was even less stringent than the regulatory scheme established in *Computer II*.

■ The Commission's exercise of ancillary jurisdiction to impose the separation requirement on AT & T is an integral part of the *Computer II* regulatory scheme. Several parties attack the validity of this

---

**72.** 359 F.2d at 284.

**73.** *Id.*

**74.** *Id.* at 284 (emphasis added).

**75.** 674 F.2d at 166–67.

**76.** *Id.* at 165–66 (citations omitted).

**77.** *Id.* at 166.

assertion of ancillary jurisdiction by the Commission. In *United States v. Southwestern Cable Co.,* 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), it was settled beyond peradventure that the Commission may assert jurisdiction under section 152(a) of the Act over activities that are not within the reach of Title II.[78] In that case, however, the Supreme Court limited the Commission's jurisdiction to that which is "reasonably ancillary to the effective performance of the Commission's various responsibilities." [79] One of those responsibilities is to assure a nationwide system of wire communications services at reasonable prices.[80]

In *Computer II* the Commission found that the exercise of ancillary jurisdiction over both enhanced services and CPE was necessary to assure wire communications services at reasonable rates. Regulation of enhanced services was deemed necessary to prevent AT & T from burdening its basic transmission service customers with part of the cost of providing competitive enhanced services. This conclusion was based upon detailed findings on AT & T's market power and its ability to underwrite its competitive offerings with profits from its monopoly services.[81] We believe this conclusion is well founded. Because rates for services provided under tariff are based partly upon the costs of providing those services, any misallocation of costs between an entity's competitive and monopoly services would allow the carrier to justify higher rates for its monopoly services. Given this potentially symbiotic relationship between competitive and monopoly services, the agency charged with ensuring that monopoly rates are just and reasonable can legitimately exercise jurisdiction over the provision of competitive services.

Likewise, we believe the Commission acted reasonably in ordering, pursuant to its ancillary jurisdiction, that CPE be removed from tariff. The Commission found that bundling CPE charges into transmission rates has a direct effect upon rates for interstate transmission services.[82] The Commission therefore concluded that exercising jurisdiction over CPE was necessary to carry out its duty to assure the availability of transmission services at reasonable rates. We believe that both the Commission's finding and its conclusion were reasonable. Because CPE charges are not based on usage, including the costs of providing CPE in the calculus for determining the reasonableness of a carrier's rates makes it difficult to identify accurately the costs of providing transmission services, which are priced according to usage. It was therefore reasonable for the Commission to exercise jurisdiction over carrier-provided CPE to ensure that rates for carrier transmission services are not based upon costs associated with the provision of CPE. Thus we conclude that the Commission's exertion of jurisdiction over enhanced services and carrier-provided CPE was "reasonably ancillary" under the *Southwestern Cable* standard.

In designing the Communications Act, Congress sought "to endow the Commission with sufficiently elastic powers such that it could readily accommodate dynamic new developments in the field of communications." [83] Congress thus hoped "to avoid the necessity of repetitive legislation." [84] In *Computer II* the Commission took full advantage of its broad powers to serve the public interest by accommodating a new development in the communications indus-

78. *United States v. Southwestern Cable Co.,* 392 U.S. at 172–73, 88 S.Ct. at 2002–03.

79. *Id.* at 178, 88 S.Ct. at 2005.

80. 47 U.S.C. § 152 (1976).

81. *See Computer II Final Decision,* 77 F.C.C.2d at 466–70.

82. *Id.* at 441, 444–46.

83. *General Telephone Co. of the Southwest v. United States,* 449 F.2d 846, 853 (5th Cir.1971).

84. *National Ass'n of Theatre Owners v. FCC,* 420 F.2d 194, 199 (D.C.Cir.1969) (footnote omitted), *cert. denied,* 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970); *see General Telephone Co. of California v. FCC,* 413 F.2d 390, 398 (D.C.Cir.), *cert. denied,* 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969).

try, the confluence of communications and data processing. Because the Commission's judgment on "how the public interest is best served is entitled to substantial judicial deference,"[85] the Commission's choice of regulatory tools in *Computer II* must be upheld unless arbitrary or capricious.[86] Our review of the Commission's decision convinces us that the Commission acted reasonably in defining its jurisdiction over enhanced services and CPE. We therefore uphold the *Computer II* scheme.

### B. *Preemption of State Regulation of CPE*

■ Some parties argue that the Commission's decision to order the states to remove CPE charges from their tariffs is an unjustifiable invasion of the authority to regulate intrastate communications services reserved to the states by the Act. To determine whether the Commission acted properly in preempting state tariffing of CPE, we must examine the Commission's powers under the Act and the asserted justification for preempting state regulation.

We have already held that the exertion of ancillary jurisdiction over carrier-provided CPE was proper under section 2(a) of the Act, which gives the Commission broad authority over "all interstate and foreign communication by wire or radio,"[87] and section 3(a) of the Act, which defines "communication by wire" to include not only transmission but also "all instrumentalities, facilities, [and] apparatus ... incidental to such transmission."[88] Many parties argue, however, that the Commission cannot exercise its ancillary jurisdiction so as to preempt state regulation of CPE. The conflict between federal and state power over CPE arises because most CPE in this country is used interchangeably for both interstate and intrastate communication and has traditionally been subject to both state and federal regulation. The cost of providing CPE has been apportioned between interstate and intrastate use and then bundled into the appropriate transmission rates.[89] Thus, it is argued, the Commission's assertion of its ancillary jurisdiction to require removal of CPE charges from state tariffs conflicts with section 2(b) of the Act, which confers on the states jurisdiction over instrumentalities of intrastate communication.[90]

The Commission asserts that preemption of state regulation is justified in this case because the objectives of the *Computer II* scheme would be frustrated by state tariffing of CPE. We agree. Courts have consistently held that when state regulation of intrastate equipment or facilities would interfere with achievement of a federal regulatory goal, the Commission's jurisdiction is paramount[91] and conflicting state regulations must necessarily yield to the federal regulatory scheme.[92] In *Computer II* the Commission found that its policy of promoting the "efficient utilization and full exploitation of the interstate telecommunications network"[93] is furthered by fostering competition in the CPE market and giving consumers an unfettered selection of CPE. According to the Commission, competition in the equipment market has had the beneficial effects of stimulating innova-

---

85. *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981).

86. 5 U.S.C. § 706(2)(a) (1976); *see, e.g., Malrite Television v. FCC*, 652 F.2d 1140, 1149 (2d Cir.1981), *cert. denied* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982).

87. 47 U.S.C. § 152(a) (1976).

88. *Id.* § 153(a).

89. *See Computer II Final Decision*, 77 F.C.C.2d at 441–42.

90. 47 U.S.C. § 152(b) (1976).

91. *See, e.g., New York Telephone Co. v. FCC*, 631 F.2d 1059, 1066 (2d Cir.1980); *California v. FCC*, 567 F.2d 84, 86–87 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1010, 98 S.Ct. 721, 54 L.Ed.2d 753 (1978); *Puerto Rico Telephone Co. v. FCC*, 553 F.2d 694, 698–700 (1st Cir.1977).

92. *Brookhaven Cable TV, Inc. v. Kelly*, 573 F.2d 765, 767 (2d Cir.1978), *cert. denied*, 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1979); *NARUC I*, 525 F.2d at 646–47.

93. *Computer II Final Decision*, 77 F.C.C.2d at 429.

tion, making available a wider range of equipment, improving maintenance and reliability, and increasing purchase, payment, and installation options.[94] When charges for CPE are bundled into transmission charges, the Commission found, the benefits of a competitive market are partially lost because consumers' freedom of choice is limited. Only if charges for CPE are entirely separate from charges for transmission service will consumers be free to select the CPE that best suits their individual needs and preferences.[95]

The Commission therefore concluded that the only way to give consumers an unfettered choice of CPE was to require that charges for CPE be completely severed from transmission rates on both the federal and state levels. Since consumers use the same CPE in both interstate and intrastate communications and generally wish to purchase both interstate and intrastate transmission services, the inclusion of CPE in charges for intrastate transmission service will certainly influence the consumer's choice of CPE. The Commission believes this restriction will be detrimental to both the consumer and the interstate communication system. Given the Commission's detailed and logical findings on this point, we cannot say the Commission's conclusion is irrational.

Our decision today is in accord with two leading cases in which the Fourth Circuit recognized that state regulation which impedes a federal regulatory goal must yield to the federal scheme. The Fourth Circuit also confirmed the Commission's jurisdiction over CPE used jointly in interstate and intrastate communications and rejected the argument that section 2(b) of the Act absolutely prohibits federal jurisdiction over jointly used CPE. In *North Carolina Utilities Commission v. FCC*, 537 F.2d 787 (4th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct.

651, 50 L.Ed.2d 631 (1976) (*NCUC I*), the court upheld the Commission's authority to determine the terms on which consumers may attach non-carrier-provided CPE to transmission facilities used for both interstate and intrastate communications.[96] The court also held that section 2(b) deprives the Commission of power over local services or facilities only where

> their nature and effect are separable from and do not substantially affect the conduct or development of interstate communications. But beyond that, we are not persuaded that section 2(b) sanctions any state regulation, formally restrictive only of intrastate communication, that in effect encroaches substantially upon the Commission's authority under sections 201 through 205.[97]

In the second leading case the Fourth Circuit reaffirmed its ruling in *NCUC I:*

> [We] correctly reasoned that if section 2(b)(1) were construed to give the states primary authority over joint terminal equipment, *i.e.,* equipment used interchangeably for interstate and intrastate service, then—whenever state regulations conflicted with federal rules applicable to interstate calls—the FCC would necessarily be prevented from discharging its statutory duty under sections 1 and 2(a) to regulate interstate communication.[98]

*Computer II* is, we believe, just such a case in which conflicting state regulations would impede the Commission in its effort to fulfill its statutory duty.

Several parties attempt to distinguish the *NCUC* cases on the ground that they did not involve Commission attempts to preempt state *ratemaking* authority. They argue that section 2(b) prohibits preemption of state tariffing of CPE. They point out that section 2(b) was designed to protect state authority over intrastate rates, enact-

94. *Id.* at 439.

95. *See id.* at 442–43.

96. *North Carolina Utilities Comm'n v. FCC*, 537 F.2d 787, 793–95 (4th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976) (*NCUC I*); *North Carolina Utilities Comm'n v.*

*FCC*, 552 F.2d 1036, 1044–52 (4th Cir.), *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977) (*NCUC II*).

97. *NCUC I*, 537 F.2d at 793.

98. *NCUC II*, 552 F.2d at 1045.

ed as it was in response to a Supreme Court decision that Congress feared would be read to permit federal agencies to set local rates based on the indirect effects such rates might have on interstate service.[99] We do not believe that section 2(b) prohibits preemption in this case. In *Computer II* the Commission has neither attempted to set rates for intrastate communications services or facilities nor asserted jurisdiction over matters of state concern because of intrastate discrimination against interstate business. Rather, the Commission here exercised its direct authority to determine the regulatory treatment of CPE used for interstate communications.

We fail to see any distinction in this case between preemption principles applicable to state ratemaking authority and those applicable to other state powers. The operative principle in this case is precisely the principle that demanded state preemption in the *NCUC* cases. There, the preemption of state regulations that restricted interconnection was justified because those regulations impeded the validly adopted federal policy of unrestricted interconnection. Similarly, in *Computer II* preemption of state tariffs on CPE is justified because state tariffs would interfere with the consumer's right to purchase CPE separately from transmission service and would thus frustrate the validly adopted federal policy. In *Computer II* the federal-state conflict would stem, as it did in the *NCUC* cases, from the practice of using CPE jointly for interstate and intrastate communication. The conflicting state policy, meant to affect

only intrastate use, would unavoidably affect the federal policy adversely. Therefore, here, as in *NCUC I* and *II*, the state regulatory power must yield to the federal.

In addition, the Act itself does not distinguish between authority over rates and authority over other aspects of communications. Sections 2(a) and (b) of the Act allocate federal and state authority with regard to both "*charges* [and] ... facilities."[100] Therefore, conflicting federal and state regulations regarding dual use CPE are no more acceptable under the Act when equipment rates are involved, as here, than when interconnection policies are involved, as in the *NCUC* cases.

In the *NCUC* cases, the Fourth Circuit also found that section 221(b) of the Act[101] did not constitute a bar to federal control of dual use CPE. That section provides that the Commission has no jurisdiction over state-regulated charges, facilities, or other matters "for or in connection with ... telephone exchange service ... even though a portion of such exchange service constitutes interstate or foreign communication."[102] The Fourth Circuit found on the basis of the legislative history that this provision was merely intended to preserve state regulation of local exchanges that happened to overlap state lines.[103] We have reviewed the legislative history and also conclude that section 221(b) is inapplicable in the circumstances of this case. Both the Senate and House committee reports specifically note that section 221(b) is intended to enable states "to regulate exchange services

---

99. *Houston, E. & W. Texas Ry. Co. v. United States,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914) (*Shreveport*). In *Shreveport* the Supreme Court upheld an ICC order that, in effect, required the revision of intrastate railroad rates that were lower than rates for comparable interstate rail services so as to remove the resulting discrimination against interstate commerce. Congress may well have intended § 2(b) of the Communications Act to prevent such a result in the communications area. *See Federal Communications Commission: Hearings on S. 2910 Before the Senate Comm. on Interstate Commerce,* 73d Cong., 2d Sess. 153, 155 (1934) (statement of K.F. Clardy); *id.* at 155–56 (statement of Andrew R. McDonald); *NCUC II,* 552 F.2d at 1047.

100. 47 U.S.C. § 152(b)(1) (1976).

101. *Id.* § 221(b).

102. *Id.*

103. *See NCUC II,* 552 F.2d at 1045; *NCUC I,* 537 F.2d at 795. The Fourth Circuit's interpretation of § 221(b) has been followed by the First Circuit, *Puerto Rico Telephone Co. v. FCC,* 553 F.2d 694, 698–99 (1st Cir.1977), and by the Second Circuit, *New York Telephone Co. v. FCC,* 631 F.2d 1059, 1064–65 (2d Cir. 1980).

in metropolitan areas overlapping State lines."[104] To the extent we appeared in *Kitchen v. FCC,* 464 F.2d 801 (D.C.Cir.1972), to take a different view of the meaning of section 221(b), we now reject the *Kitchen* analysis and adopt what we believe to be the more sound interpretation of that section expounded by the Fourth Circuit in the *NCUC* cases.

Some parties also argue that the Commission has unlawfully attempted to preempt state regulation of dual use CPE by creating a vacuum of deregulation. They contend that preemption can be accomplished only by affirmative regulation that occupies the field. These parties misapprehend the Commission's actions. Although the Commission has discontinued Title II regulation of CPE, it has substituted a different, *affirmative* regulatory scheme through its ancillary jurisdiction.[105] Furthermore, we perceive no critical distinction between preemption by Title II regulation and preemption by the exercise of ancillary jurisdiction.[106] It is clear to us that the *Computer II* regulations embody a comprehensive federal regulatory scheme, including rules governing the marketing of CPE by common carriers. We agree with the Second Circuit: "Federal regulation need not be heavy-handed in order to preempt state regulation."[107]

Some parties argue forcefully that the states, like the Commission, have a responsibility to protect the interests of consumers and that the best way to do this is to continue to tariff CPE. We cannot engage in debate about whether a policy of price control through tariffing or a policy of free competition best serves the public interest in this area. All we are empowered to do is to determine whether the Commission had the statutory authority to adopt the policy it did and whether that policy is arbitrary or capricious or an abuse of discretion. We believe that Congress has empowered the Commission to adopt policies to deal with new developments in the communications industry and that the policy favoring regulation by marketplace forces embodied in *Computer II* is neither arbitrary, capricious, nor an abuse of discretion. With this holding our review of the wisdom of state preemption is at an end.

It is also contended that the Commission failed to give adequate notice of its intention to detariff CPE and to preempt state tariffing. We reject this argument. In the *Tentative Decision* issued almost a year prior to the *Final Decision,* the Commission retained tariff regulation of "basic" CPE, but queried "whether it would be more advantageous to the consumer for all customer-premises equipment to be provided solely on a non-tariffed basis."[108] The Commission solicited comments on six options, including "deregulation of ... all customer-premises equipment."[109] The Commission did not, in the *Tentative Decision,* explicitly state that preemption of state regulations was under consideration. Such a statement was not necessary, for preemption of any inconsistent state regulatory scheme would follow automatically under the Supremacy Clause and other principles discussed above. In any event, preemption was explicit in the *Final Decision.* The state parties had—and took full advantage of—opportunities to voice their objections to the Commission's decision. The Commission entertained petitions for reconsideration of the *Final Decision* and in fact made changes to accommodate concerns ex-

---

104. S. REP. No. 781, 73d Cong., 2d Sess. 5 (1934); H.R. REP. No. 1850, 73d Cong., 2d Sess. 7 (1934).

105. This scheme includes continued regulation of interconnection for all CPE and strengthening of all interconnection opportunities, establishment of unbundled charges, and structural separation to guard against cross-subsidization where necessary.

106. *Accord Brookhaven Cable TV, Inc. v. Kelly,* 573 F.2d 765 (2d Cir.1978), *cert. denied,* 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1979).

107. *New York State Comm'n on Cable Television v. FCC,* 669 F.2d 58 (2d Cir.1982).

108. *Computer II Tentative Decision,* 72 F.C.C.2d at 438.

109. *Id.* at 441.

pressed by the states.[110] We thus reject the parties' challenges to the Commission's power to preempt state regulation of CPE that is inconsistent with the *Computer II* rules.

## C. *Separation*

A number of parties attack the Commission's decision by contending that the separate subsidiary requirement should have been imposed on at least some common carriers in addition to AT & T. Others challenge the separation aspect of the *Computer II* rules on the basis that the separate subsidiary requirement imposed on AT & T is not sufficiently rigorous. In our view both of these arguments represent, in essence, disagreement with a choice made by the Commission among several reasonable policy options. Those who disagree with the Commission's decision on how and where to draw the line regarding the separation question would have this court substitute its judgment for that of the Commission. This we are neither authorized nor inclined to do.

■, In *Computer II* the Commission sought to strike a reasonable balance between competing concerns; this task was specifically delegated to the agency by Congress and should be accorded special deference by the judiciary. Our function here is only to ensure that the Commission's action in adopting the separation scheme did not constitute an abuse of discretion. We are convinced that the Commission engaged in reasoned decisionmaking well within the scope of its discretion, and we therefore uphold the separation portion of the *Computer II* rules.

In its decision the Commission explained that the maximum separation requirement would apply only to AT & T since, in the Commission's judgment, AT & T is the only common carrier having "sufficient market power to engage in effective anti-competitive activity on a national scale and ... sufficient resources to enter the competitive market through a separate subsidiary." [111] Originally, the Commission decided to subject GTE to the separation requirement also,[112] but after receiving additional comments from the industry, decided to exempt GTE.[113]

We believe this to be a reasonable judgment on the Commission's part. The Commission's task of developing a policy to carry out its goal of encouraging competition was a difficult one. Through the separation requirement the Commission sought to protect the public from unfair competition by powerful carriers. At the same time the Commission tried to ensure that competition would be strengthened by the entry of less powerful carriers into the market by exempting from the separation requirement those carriers that cannot engage in significant anti-competitive conduct.

In reaching its decision to impose separation only on AT & T, the Commission considered four factors: (1) the carrier's ability to engage in anti-competitive activity through its control of local exchange facilities, (2) the carrier's ability to cross-subsidize its competitive activities through its monopoly services, (3) the degree to which the carrier possesses integrated research and manufacturing capabilities, and (4) the carrier's economic ability to enter the market through a separate subsidiary.[114] The Commission also noted statistics regarding each carrier's revenues, market share, and

---

110. For example, in its *Reconsidered Decision* the Commission adopted a bifurcation plan that should ameliorate state concerns regarding immediate impact on state regulation of existing CPE. In its *Further Reconsidered Decision* the Commission stated that it would allow the states to establish additional accounting requirements and structural separation for carriers other than AT & T.

111. *Computer II Final Decision,* 77 F.C.C.2d at 469.

112. *Id.* at 389.

113. *Computer II Reconsidered Decision,* 84 F.C.C.2d at 72.

114. *Id.*

market size.[115] It seems to us that the basis for the Commission's decision is rational and adequately explained. We are not inclined to quarrel with the expert agency's judgment, especially when, as here, the Commission exhibited thoughtful deliberation by exempting GTE from the separation requirement after receiving more information about the nature and extent of GTE's resources.[116]

Moreover, certain safeguards were adopted with regard to the exempt carriers. For example, if such carriers wish to offer enhanced services, they must sell themselves the basic transmission service "pursuant to the terms and conditions embodied in their tariff." [117] Exempt carriers are also required to adopt adequate accounting measures to ensure that costs and revenues from their regulated and unregulated activities are not improperly commingled.[118] The Commission noted its readiness to impose the separation requirement more broadly in the future if circumstances warrant.[119] We therefore hold that limiting the separation requirement to AT & T was not arbitrary, capricious, or an abuse of discretion.

■ Likewise, we reject the argument that the structural separation requirement imposed on AT & T is impermissibly lenient. We need not discuss the mechanical details of the separation scheme. It is sufficient to note that the scheme relies upon corporate separateness, accounting procedures, and resale requirements to ensure that no cross-subsidization or unfair competitive practices occur. No aspect of the *Computer II* rules more warrants our deference than these requirements. The Commission, having chosen a permissible regulatory tool—structural separation—set out detailed plans for implementing it. These plans were based upon the Commission's own expertise and experience in regulating the communications industry and upon the comments of the members of that industry. This court is ill-prepared to decide which mechanical requirements would best implement the structural separation scheme. Our only province is to determine whether the separation requirements were "based on a consideration of the relevant factors and whether there has been a clear error of judgment." [120]

Among the factors considered by the Commission in formulating the details of the separation scheme were the comments of various parties, business practices in the communications industry, the costs and benefits of various degrees of separation, and the efficacy of various separation tools. We have perused the Commission's decision carefully, and we find that these requirements were based upon consideration of the relevant factors. In addition, we find no clear error of judgment in the Commission's choice of the degree of separation necessary and its reliance upon certain separation tools in preference to others. Therefore, we uphold the *Computer II* separation regulations in their entirety.

### D. *Consent Decree Issues*

■ In 1949 the Justice Department sued AT & T and its manufacturing subsidiary, Western Electric, alleging various antitrust violations. The litigation ended in 1956 when a consent decree was approved by the United States District Court for the District of New Jersey.[121] The consent decree placed severe restrictions on AT & T's entry into unregulated non-communications mar-

---

115. *Computer II Final Decision*, 77 F.C.C.2d at 469–71.

116. *Computer II Reconsidered Decision*, 84 F.C.C.2d at 72–73.

117. *Id.* at 75 n. 19.

118. *Computer II Final Decision*, 77 F.C.C.2d at 476.

119. *Computer II Further Reconsidered Decision*, 88 F.C.C.2d at 541.

120. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

121. United States v. Western Electric Co., 1956 Trade Cas. (CCH) ¶ 68,246 (D.N.J. 1956).

kets.[122] In designing the *Computer II* regulatory scheme, the Commission concluded that AT & T's participation in the new regime would be compatible with the consent decree. Although the Commission recognized that it could not definitively construe the decree,[123] it expressed its belief that the separate subsidiary requirement set forth in the *Computer II* decision constituted sufficient "public regulation" of AT & T's offerings of CPE and enhanced services to satisfy the demands of the consent decree.[124]

Several parties urge this court to reverse the Commission's decision in *Computer II* on the theory that it rests upon an *ultra vires* and incorrect interpretation of the 1956 consent decree. They suggest that this court should review and reject the Commission's reading of the decree. This issue has been largely mooted by vacation of the consent decree as part of the settlement of the Justice Department's 1974 antitrust suit against AT & T.[125]

However, we do note that the Commission's consideration of the effect of the consent decree upon the *Computer II* rules was not improper and did not taint the regulations. The Commission did not purport to construe the decree; rather, the existence of the decree and its meaning in the Commission's view were simply circumstances affecting the communications industry. It was entirely proper for the Commission to take these circumstances into account in formulating the *Computer II* rules. Even though vacation of the decree has now changed these circumstances, it is clear to us that considerations prompted by the decree are not so fundamental to the *Computer II* scheme that the decree's vacation vitiates the basis for the regulations.

Thus, we reject the challenges based on the consent decree issue.

### III. CONCLUSION

For the foregoing reasons, the decision of the Commission is

*Affirmed.*

---

**122.** Section V of the consent decree prohibits AT & T and all of its subsidiaries, except Western Electric and Western Electric subsidiaries, from engaging in any business activities aside from "the furnishing of common carrier communications services," *id.* at 71,138, defined by Section II(i) as "communications services and facilities ... the charges for which are subject to public regulation under the Communications Act of 1934," *id.* at 71,137.

**123.** *Computer II Final Decision,* 77 F.C.C.2d at 492.

**124.** *Id.* at 492–93.

**125.** Opinion, United States v. American Telephone & Telegraph Co., Civ.Action No. 74–1698, at 83–100 (D.D.C. Aug. 11, 1982), *as modified,* Civ.Action No. 82–0192 (D.D.C. Aug. 24, 1982).