750 F.2d 135
 242 U.S.App.D.C. 287
 MCI TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Aeronautical Radio, Inc., United States Independent
Telephone Association, American Telephone & Telegraph
Corporation, et al., Southern Pacific Communications
Company, Municipality of Anchorage, d/b/a Anchorage
Telephone Utility, United States Transmission Systems, Inc.,
Ad Hoc Telecommunications Users Committee, GTE Service
Corporation, Satellite Business Systems, Rural Telephone
Coalition, et al., United Telephone Systems, Inc., National
Association of Regulatory Utility Commissioners, State
Corporation Commission of the State of Kansas, People of the
State of California, et al., International Business Machines
Corporation, Intervenors.
LOUISIANA PUBLIC SERVICE COMMISSION, Petitioner
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Telephone & Telegraph Corporation, et al., United
States Transmission Systems, Inc., GTE Service Corp., et
al., People of the State of California, et al., Ad Hoc
Telecommunications Users Committee, Southern Pacific
Communications Co., United Telephone System, Inc., MCI
Telecommunications Corporation, Municipality of Anchorage,
d/b/a Anchorage Telephone Utility, Satellite Business
Systems, International Business Machines Corporation, Intervenors.
 Nos. 82-1237, 82-1456.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 23, 1983.
Decided Dec. 18, 1984.
 
 William J. Byrnes, Washington, D.C., with whom Michael H. Bader, Kenneth A. Cox, Raymond C. Fay, Chicago, Ill., Robert E. Conn, and Ruth S. Baker-Battist, Washington, D.C., were on the brief, for MCI Telecommunications Corp., petitioner in No. 82-1237 and intervenor in No. 82-1456. Phillip Nyborg and John M. Pelkey, Washington, D.C., also entered appearances for MCI Telecommunications Corp.
 Paul L. Zimmering, New Orleans, La., of the Bar of the Supreme Court of the State of La., pro hac vice, by special leave of the court, with whom Michael R. Fontham, New Orleans, La., was on the brief, for Louisiana Public Service Com'n, petitioner in No. 82-1456.
 Michael Deuel Sullivan, Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and John E. Ingle, Deputy Associate Gen. Counsel, F.C.C. and Robert B. Nicholson and Neil R. Ellis, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents in Nos. 82-1237 & 82-1456. Lisa Margolis, Counsel, F.C.C., John J. Powers, III and William J. Roberts, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 
 
 1
 Jules M. Perlberg, Chicago, Ill., with whom David J. Lewis, Washington, D.C., Howard J. Trienens, Judith A. Maynes, New York City, and O. Carey Epps, Oklahoma City, Okl., were on the brief for intervenor American Telephone & Telegraph Corp. in Nos. 82-1237 & 82-1456. Alfred Winchell Whittaker, Keith E. McClintock, New York City, and Raymond F. Scully, Washington, D.C., also entered appearances for American Telegraph & Telephone Corp.
 
 
 2
 Richard McKenna and James R. Hobson, Washington, D.C., were on the brief for intervenors GTE Service Corp., et al. in Nos. 82-1237 and 82-1456.
 
 
 3
 J. Roger Wollenberg, William T. Lake, Roger M. Witten and Thomas F. Connell, Washington, D.C., were on the brief for International Business Machines Corp. in Nos. 82-1237 and 82-1456.
 
 
 4
 Thomas J. O'Reilly, Washington, D.C., was on the brief for intervenor United States Independent Telephone Ass'n in No. 82-1237.
 
 
 5
 John L. Bartlett and Howard D. Polsky, Washington, D.C., entered appearances for intervenor Aeronautical Radio, Inc. in No. 82-1237.
 
 
 6
 James M. Tobin, Daniel A. Huber, Mitchell F. Brecher and Mark P. Bresnahan, Washington, D.C., entered appearances for intervenor Southern Pacific Communications Co. in Nos. 82-1237 and 82-1456.
 
 
 7
 Michael L. Glaser, Washington, D.C., entered an appearance for intervenor Anchorage Telephone Utility in Nos. 82-1237 and 82-1456.
 
 
 8
 John A. Ligon, New York City, entered an appearance for intervenor United States Transmission Systems in Nos. 82-1237 and 82-1456.
 
 
 9
 Joseph M. Kittner and Edward P. Taptich, Washington, D.C., entered appearances for intervenor, Ad Hoc Telecommunications Committee in Nos. 82-1237 and 82-1456.
 
 
 10
 F. Thomas Tuttle, McLean, Va., Harold David Cohen, Jack N. Goodman, J. Laurent Scharff, W. Theodore Pierson and Richard M. Singer, Washington, D.C., entered appearances for intervenor Satellite Business Systems in Nos. 82-1237 and 82-1456.
 
 
 11
 Alan Y. Naftalin, Margot Smiley Humphrey, David Cosson, Amy S. Gross, David A. Irwin and Ellen S. Deutsch, Washington, D.C., entered appearances for intervenors Rural Telephone Coalition et al. in Nos. 82-1237 and 82-1456.
 
 
 12
 Carolyn C. Hill, Washington, D.C., entered an appearance for United Telephone System, Inc. in Nos. 82-1237 and 82-1456.
 
 
 13
 Paul Rodgers, Charles D. Gray and Deborah A. Dupont, Washington, D.C., entered appearances for intervenor Nat. Ass'n of Regulatory Utility Com'rs in No. 82-1237.
 
 
 14
 Donald A. Low, Topeka, Kan., entered an appearance for intervenor State Corp. Com'n of the State of Kan. in No. 82-1237.
 
 
 15
 Before WILKEY* and MIKVA, Circuit Judges, and BAZELON, Senior Circuit Judge.
 
 
 16
 Opinion for the Court filed by BAZELON, Senior Circuit Judge.
 
 BAZELON, Senior Circuit Judge:
 
 17
 Petitioners challenge a Federal Communications Commission's (FCC) decision modifying the formula that separates costs for telephone equipment used in both interstate and intrastate services. In these consolidated cases, two issues are raised. First, the MCI Telecommunications Corporation (MCI) and the Louisiana Public Service Commission (PSC) contest the FCC's adoption of an interim freeze of the separations formula allocating the costs of non-traffic sensitive plant between intrastate and interstate jurisdictions. Second, the PSC also challenges the phase-out of the costs of embedded customer premises equipment from the separations process. Because the FCC is working to achieve a reasonable cost apportionment, the FCC's decision is affirmed.
 
 I. BACKGROUND
 
 18
 Much telephone equipment is jointly used to provide both interstate and intrastate services. Subscriber plant equipment includes the telephone, the wiring inside a customer's home, the line connecting homes to the local switching office, and the termination of that access line in the local switching office. Subscriber plant equipment is termed non-traffic sensitive, because its costs do not vary with the level of use. Customer plant equipment (CPE) is part of the jointly used plant. CPE includes telephones, answering machines, key systems, and private branch exchange switchboards.
 
 
 19
 "Jurisdictional separation" is a procedure that determines what proportion of jointly used plant should be allocated to the interstate and intrastate jurisdictions for ratemaking purposes. Jointly used plant whose costs are traffic sensitive is generally allocated on the basis of actual or relative use. On the other hand, non-traffic sensitive plant has been more difficult to allocate appropriately. The FCC has been struggling for many years to derive a reasonable apportionment formula for nontraffic sensitive plant costs.
 
 A. The 1970 Ozark Plan
 
 20
 Jurisdictional separations since 1947 have been performed almost entirely on the basis of a separations manual. This manual is developed jointly by the FCC and the National Association of Regulatory Utility Commissioners. The 1947 manual provided for the allocation of subscriber plant equipment between the interstate and intrastate jurisdictions on the basis of relative use. This basis of relative use is commonly referred to as subscriber line use (SLU). Since 1947, there have been five major revisions of the manual, the most recent being the 1970 Ozark Plan.[1]
 
 
 21
 Under the Ozark Plan, subscriber plant costs were allocated pursuant to a formula that has the effect of assigning approximately 3.3 percent of the non-traffic sensitive costs of subscriber plant equipment to the interstate jurisdiction for every 1 percent of interstate calling.[2] This percentage allocation is called a subscriber plant factor (SPF), which is determined by the formula. The purpose of SPF was to compensate for the deterrent effect of toll rate schedules on interstate calling.[3] No one sought judicial review of the Ozark Plan, and it has since its inception determined jurisdictional separations.
 
 
 22
 Following the adoption of the Ozark Plan, the telecommunications industry underwent fundamental changes. Overall, the provision of long-distance services has become subject to intense and increasing competition.[4] The recent political climate in which agencies must operate has been characterized as a "rush to deregulate."[5] In addition, rapid technological advances may create the need for interim solutions. Here the merging of computer and communications technologies redefined the equipment that was part of CPE.[6] Amidst these sweeping changes, two specific factors generated the FCC's concerns about whether the existing separations manual should be revised. First, there has been a great increase in the level of interstate calling relative to intrastate calling. While interstate usage was estimated to increase from 5.5% to 8.3% from 1972-83, the non-traffic sensitive costs allocated to the interstate jurisdiction increased from approximately $1.9 billion to $11.2 billion.[7] This resulted from the use of the SPF factor that caused the allocation to the interstate jurisdiction to grow about three times as fast as usage. Second, the FCC concluded in Computer II,[8] that the provision of CPE should no longer be considered a common carrier activity subject to tariff regulation.
 
 
 23
 In response to these developments, the FCC, in June 1980, initiated Docket No. 80-286 by establishing a Federal-State Joint Board[9] to reexamine the FCC's separations procedures.[10] The Joint Board invited public comment on a specific plan for phasing CPE out of the separations process. The Joint Board also set forth questions relating to the general treatment of non-traffic sensitive plant in the separations process.[11] After considering the comments of the parties, the Joint Board issued its recommendations on December 14, 1981.
 
 B. The FCC's Orders
 
 24
 After inviting public comment on the recommended orders,[12] the FCC adopted the Joint Board's proposals with minor modifications.[13] 3] Pursuant to that decision, SPF is frozen at the average 1981 annual percentage levels as an interim measure pending the development of comprehensive revisions in the separations procedures. The FCC also instituted a five-year phase-out of embedded CPE costs from the separations process at the rate of one-sixtieth per month.
 
 1. The SPF Freeze
 
 25
 The FCC concluded that use of SPF had increased the proportion of non-traffic sensitive plant allocated to the interstate jurisdiction dramatically, and that this trend was likely to continue. The FCC indicated that:
 
 
 26
 [T]welve years of experience have shown that the adjustment made in the present allocation formula for whatever deterrence that may exist is excessive .... [I]nterstate usage has risen substantially enough to significantly inflate the non-traffic sensitive costs allocated to interstate above the level considered acceptable in 1970.[14]
 
 
 27
 Furthermore, the concomitant increase in interstate rates spurred the prospect of bypass--the use of facilities other than the telephone companies' existing local exchange networks to originate and terminate interstate calls.[15] The halt of the growth of SPF was an interim measure--a means of preserving the status quo pending completion of the comprehensive separations package. Because this was an interim measure, the FCC deferred consideration of basic issues that were being evaluated by the Joint Board in the design of a comprehensive and permanent plan.[16]
 
 
 28
 The freeze was preferred as an interim measure because it maintained allocations for non-traffic sensitive plant at a fixed percentage level. Other possible interim measures might "benefit some users and prejudice others as a result of usage fluctuations during the course of Joint Board and Commission deliberations."[17] Furthermore, while the freeze imposed a cap on the percentage of non-traffic sensitive costs allocated to the interstate jurisdiction, it allowed a growth in the absolute dollar allocation. Hence, if non-traffic sensitive total costs increase as a result of inflation or additional investment, the interstate share of those total costs also will increase.[18]
 
 2. The CPE Phase-Out
 
 29
 In Computer II, the FCC determined that CPE should not be a common carrier service offered under tariff regulation.[19] Because CPE is readily severable from basic transmission service, tariff regulation might inhibit effective competition.[20] The FCC decided to bifurcate the deregulation of CPE. CPE acquired after January 1, 1983 would be excluded from a carrier's rate base and from tariff regulation. CPE already embedded in the rate base ("embedded CPE") was more troublesome. This was because reimbursement through interstate rates provided important revenues to carriers with embedded CPE. Significant economic dislocations would be caused by an abrupt removal of embedded CPE from regulation. Furthermore, detariffing embedded CPE would take time, because of the difficulties of valuing CPE.[21]
 
 
 30
 The FCC required carriers to identify a base amount of CPE as of January 1, 1983, for use in the separations process. The base amount reduces at a rate of one-sixtieth per month over a five-year period, corresponding to the time in which the FCC anticipates that embedded CPE will be removed from the rate base of all carriers.[22]
 
 
 31
 The FCC preferred this solution over a number of other methods that were considered because it would encourage states to adopt policies favoring the sale or transfer from the rate base of embedded CPE. This transitional solution would therefore implement the goals and policies of Computer II more readily. The phased removal of CPE was determined to be a reasonable compromise of the FCC's twin objectives of encouraging a competitive marketplace and of avoiding undue dislocations during the transition.[23]
 
 
 32
 Petitioner MCI challenges the FCC's decision to freeze SPF, claiming that it is unconstitutional and unreasonable. Petitioner PSC takes the opposite view, arguing that the order is an unreasonable attempt to halt the growth of the SPF. PSC also challenges the validity of the FCC's order phasing out embedded CPE from the separations process. Because the orders are reasonable and are not unconstitutional, the FCC's decision is affirmed.
 
 II. DISCUSSION
 
 33
 The FCC's plans were based upon the Commission's expertise and experience in regulating the communications industry and upon hearing the comments of that industry's members.[24] Our review is limited to whether the separation requirements resulted from a consideration of relevant factors and whether there was a clear error of judgment.[25] Furthermore, substantial deference by courts is accorded to an agency when the issue concerns interim relief.[26] Here the FCC engaged in reasoned decisionmaking well within the scope of its discretion.
 
 A. The SPF Freeze
 
 34
 Petitioner MCI contends that the continued use of SPF is unlawful under the requirements of Smith v. Illinois Bell Telephone Co.[27] MCI urges that Smith requires cost separation based upon a relative usage principal (SLU). MCI's claim, however, must only be considered in the context of the regulation that is actually being challenged here.[28] Hence, the question that must be addressed is whether Smith constitutionally requires that the interim freeze is per se unlawful because the transitional separations process is not based on relative use.
 
 
 35
 MCI's interpretation of Smith must be rejected here. The Smith court was not considering the constitutionality of an interim ratemaking solution. Substantial deference must be accorded an agency when it acts to maintain the status quo so that the objectives of a pending rulemaking proceeding will not be frustrated. What needs to be shown to uphold the FCC is that "existing, possibly inadequate rules" had to be frozen to avoid "compounding present difficulties."[29] This standard was easily met. The record before the FCC contained substantial evidence of the need for an interim freeze of SPF. The FCC explained that the basis for the SPF freeze was to preserve its ability to implement comprehensive separations revisions in a manner that would cause the least upheaval in the industry. It is reasonable for the FCC to take into account the ability of the industry to adjust financially to changing policies.
 
 
 36
 Furthermore, Smith appears to be based on the limits of state jurisdiction, rather than on constraints imposed on federal agencies by the due process clause.[30] Smith does not constitutionally compel use of a particular formula. Smith compels "only reasonable measures,"[31] because the "[a]llocation of costs is not a matter for the slide-rule," but "involves judgment on a myriad of facts."[32] Cost allocation is not purely an economic issue--it necessarily involves policy choices that are not constitutionally prescribed. Interim solutions may need to consider the past expectations of parties and the unfairness of abruptly shifting policies.
 
 
 37
 For similar reasons, petitioner PSC's contention that it was unreasonable to freeze SPF must be rejected. The FCC concluded that an interim freeze was necessary because SPF had not performed as an allocative factor as had been originally envisioned. The freeze was a response to an unanticipated rise in the percentage of interstate costs. Given the changes in the competitive structure of the telecommunications industry, it was likely that the FCC would reduce the allocation to the interstate jurisdiction.[33] Had the FCC allowed the SPF percentage to continue to rise, the anticipated restructuring would have been exceedingly disruptive. The FCC reasonably concluded that the SPF freeze would best preserve the status quo and cushion the effects of future rulemaking. The record shows that there was sufficient attention to required rulemaking procedures.
 
 B. The CPE Phase-Out
 
 38
 The PSC challenges the five-year phase-out of CPE. It contends that the FCC did not adequately explain the need for any action with respect to embedded CPE.[34] Furthermore, PSC argues that the FCC did not take into account the effect of its decision on local rates, and that its order will eventually result in intrastate ratepayers shouldering an undue cost burden.
 
 
 39
 The FCC's decision in Computer II,[35] however, forecloses these arguments. In Computer II, it was decided that the provision of CPE, whether new or embedded, should no longer be a common carrier and therefore not subject to tariff regulation. In affirming the FCC's decision, this court held:
 
 
 40
 both the Commission's finding and its conclusion were reasonable. Because CPE charges are not based on usage, including the costs of providing CPE in the calculus for determining the reasonableness of a carrier's rates makes it difficult to identify accurately the costs of providing transmission services, which are priced according to usage. It was therefore reasonable for the Commission to exercise jurisdiction over carrier-provided CPE to ensure that rates for carrier transmission services are not based upon costs associated with the provision of CPE.[36]
 
 
 41
 Since the FCC could deregulate all CPE today, it is unreasonable to preclude the agency from avoiding hardships by denying it the power to phase-out the regulations. Because there is no purely economic allocation of common costs, elements of fairness and other values must enter the analysis of the choice to be made.[37] The FCC's actions in the prevailing climate of deregulation are not invalid. The five-year phase-out implements a policy in a way that has minimal impact on local rates, consistent with the goal of detariffing. The phase-out helps to avoid undue economic dislocations.[38]
 
 
 42
 Again, the FCC followed correct procedures and its conclusions are justified. The estimates made by an agency, if rationally explained, are entitled to deference by courts.[39] Here the removal of CPE separations reasonably accommodates the separations process to the deregulation of CPE.
 
 III. CONCLUSION
 
 43
 The Federal Communications Commission properly explained its reasons for the interim freeze of SPF and the phase-out of embedded CPE. These temporary and ameliorative solutions are supported by adequate evidence. For the foregoing reasons, the decision of the Commission is
 
 
 44
 Affirmed.
 
 
 
 *
 Circuit Judge Wilkey considered this case prior to his taking Senior status
 
 
 [1]
 Prescriptions of Procedures for Separating and Allocating Plant Investment, Operating Expenses, Taxes and Reserve Between the Interstate and Intrastate Operations of Telephone Companies, 26 F.C.C.2d 247 (1970)
 
 
 [2]
 The specific formula used is: SPF = 0.85 SLU + (2 SLU X CSR). SPF is the subscriber plant factor; SLU is the subscriber line use as measured by the ratio of interstate use to total use; and CSR is the composite station rate, a ratio that combines measurements of average initial three-minute station charges and average lengths of haul for interstate toll calls. See Amendment of Part 67 of the Commission's Rules and Establishment of a Joint Board (Notice of Proposed Rulemaking and Order Establishing a Joint Board), 78 F.C.C.2d 837, 841 (1980) (Section 23.44 of the Separations Manual)
 
 
 [3]
 26 F.C.C.2d at 251. The deterrent effect was the result of the different forms of rate tariffs imposed on local versus long distance calls. The exchange rate service with flat rate tariffs encourage unlimited local calling and unlimited local conversation time. Alternatively, toll service is generally offered as a measured rate service and therefore was believed for economic reasons to deter the telephone subscribers' use of the subscriber plant for toll services. See American Tel. & Tel. Co., 9 F.C.C.2d 30, 102 (1967)
 
 
 [4]
 See, e.g., Hush-a-Phone Corp. v. FCC, 238 F.2d 266 (D.C.Cir.1956); Carterfone, 13 F.C.C.2d 420, recon. denied, 14 F.C.C.2d 571 (1968); see also Economic Implications Arising from Customer Interconnection, 75 F.C.C.2d 506, 534, 545 (1980)
 
 
 [5]
 See generally S. TOLCHIN & M. TOLCHIN, DISMANTLING AMERICA: THE RUSH TO DEREGULATE (1983)
 
 
 [6]
 This led to Computer II. See Computer and Communications Indus. Ass'n v. FCC, 693 F.2d 198, 204 (D.C.Cir.1982), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983); see also infra note 8
 
 
 [7]
 See Notice of Proposed Rulemaking and Order Establishing a Joint Board, 78 F.C.C.2d 837, 842 (1980)
 
 
 [8]
 Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry): Notice of Inquiry and Proposed Rulemaking, 61 F.C.C.2d 103 (1976); Tentative Decision, 72 F.C.C.2d 358 (1979); Final Decision, 77 F.C.C.2d 384 (1980); Decision on Reconsideration, 84 F.C.C.2d 50 (1980); Decision on Further Reconsideration, 88 F.C.C.2d 512 (1981). This court upheld that decision in Computer and Communications Indus. Ass'n v. FCC, 693 F.2d 198 (D.C.Cir.1982), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983)
 
 
 [9]
 Since 1971, state participation has been formalized by the creation of a Federal-State Joint Board, which issues a recommended decision to the FCC in all proceedings related to the separations process. See 47 U.S.C. Sec. 410(c) (1976)
 
 
 [10]
 78 F.C.C.2d at 837
 
 
 [11]
 Order Inviting Comments and Suggested Information Requests, 46 Fed.Reg. 32,281 (1981)
 
 
 [12]
 Further Notice of Proposed Rulemaking, 46 Fed.Reg. 63,357 (1981)
 
 
 [13]
 Decision and Order, 89 F.C.C.2d 1 (1982)
 
 
 [14]
 Id. at 4-5
 
 
 [15]
 See AT & T Intervenor's Brief at 9 & n. 10
 
 
 [16]
 On December 1, 1983, the FCC decided upon a transition from the frozen SPF to a 25 percent base factor apportionment beginning in 1986. See infra note 33
 
 
 [17]
 89 F.C.C.2d at 6
 
 
 [18]
 Id. at 13-14
 
 
 [19]
 Final Decision, 77 F.C.C.2d 384, 435-47 (1980); see supra note 8
 
 
 [20]
 Id. at 438-47
 
 
 [21]
 88 F.C.C.2d at 518-28; 84 F.C.C.2d at 64-69
 
 
 [22]
 89 F.C.C.2d at 19-20
 
 
 [23]
 Id. at 18-20, 24-25
 
 
 [24]
 The statutory basis for the FCC's action is 47 U.S.C. Sec. 221(c) (1976), which authorizes it to determine "what property of [a] carrier shall be considered as used in interstate" service for ratemaking purposes
 
 
 [25]
 Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); Computer and Communications Indus. Ass'n v. FCC, 693 F.2d 198, 219 (D.C.Cir.1982), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983)
 The materials, which the FCC moved to strike from the Joint Appendix, did not affect the result of this case. These documents included two FCC decisions and testimony given publicly to Congress. Furthermore, the FCC acknowledged that this court could consider the documents by judicial notice.
 
 
 [26]
 See Nader v. Nuclear Regulatory Comm'n, 513 F.2d 1045 (D.C.Cir.1975); Wellford v. Ruckelshaus, 439 F.2d 598, 601 (D.C.Cir.1971)
 
 
 [27]
 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930). Smith involved review of an intra -state rate determination by the Illinois Commerce Commission. In evaluating the approved rates and deciding that they were confiscatory and hence denied due process, the lower court had looked to the total property of the carrier to determine the reasonableness of the rates. This was done despite the fact that this property was used to provide both intrastate and interstate services. On review, the Supreme Court said it could not decide whether the rates had been reasonably set absent "an appropriate determination of the value of the property employed in the intrastate business and of the compensation receivable for the intrastate service under the rate prescribed." Id. at 149, 51 S.Ct. at 69
 
 
 [28]
 The issue before us is not whether the 1970 decision to use SPF was unlawful; nor whether the transition in 1986 to the basic 25 percent interstate allocation factor is unlawful. The legal relationships under our review in this case are the interim solutions imposed by the FCC. See Fidelity Television, Inc. v. FCC, 502 F.2d 443, 448 (D.C.Cir.1974) (order is final for purposes of review if it fixes some legal relationship as a consummation of the administrative process)
 
 
 [29]
 Kessler v. FCC, 326 F.2d 673 (D.C.Cir.1963); see also Meredith Broadcasting Co. v. FCC, 365 F.2d 912 (D.C.Cir.1966)
 
 
 [30]
 See Lone Star Gas Co. v. Texas, 304 U.S. 224, 241, 58 S.Ct. 883, 891, 82 L.Ed. 1304 (1938); National Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095, 1112 (D.C.Cir.1984)
 
 
 [31]
 282 U.S. at 150, 51 S.Ct. at 69
 
 
 [32]
 See Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945); see also MCI Telecommunications Corp. v. FCC, 675 F.2d 408, 415 (D.C.Cir.1982)
 
 
 [33]
 In fact, the FCC did later impose a 25 percent base factor apportionment that would be implemented in 1986. See Jurisdictional Separation Procedures; Amendment of the Commission's Rules and Establishment of a Joint Board, 49 Fed.Reg. 7934 (1984). This decision is not presently at issue before this court
 
 
 [34]
 PSC again relies on Smith, 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930), in arguing that a reasonable apportionment of property between jurisdictions requires that such an allocation be based on usage. For reasons previously stated, see supra pp. 13-14, we reject this analysis of Smith. A further distinguishing point is that CPE is, by its nature, non-traffic sensitive, and therefore allocations need not be purely economically based upon usage
 
 
 [35]
 Computer II Implementation Proceeding, Notice of Inquiry, 89 F.C.C.2d 694 (1982)
 
 
 [36]
 Computer and Communications Indus. Ass'n v. FCC, 693 F.2d 198, 213 (D.C.Cir.1982), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983)
 
 
 [37]
 See MCI Telecommunications Corp. v. FCC, 675 F.2d 408, 415-16 (D.C.Cir.1982)
 
 
 [38]
 If the phase-out does not coincide in the future with the actual removal of CPE, the FCC put adequate flexibility in its order to deal with it. See 89 F.C.C.2d at 17-18, 22-23, 31; 91 F.C.C.2d at 559, 564-66
 Furthermore, under the AT & T consent decree in United States v. AT & T, 552 F.Supp. 131 (1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), embedded CPE now owned by Bell operating companies was assigned to AT & T under certain conditions. See In the Matter of Policy and Rules Concerning the Furnishing of Customer Premises Equipment, Enhanced Services and Cellular Communications Services by the Bell Operating Companies, 95 F.C.C.2d 1117 (1983). Thus, operating companies may continue to receive contributions from interstate services after they relinquish their embedded CPE.
 
 
 [39]
 See FCC v. WNCN Listeners Guild, 450 U.S. 582, 595-96, 101 S.Ct. 1266, 1274-75, 67 L.Ed.2d 521 (1981); Telocator Network of America v. FCC, 691 F.2d 525, 538 (D.C.Cir.1982)